1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   BILLY PAUL BIRDWELL, II,

11            Petitioner,                    No. CIV S-09-2024 LKK DAD P

12       vs.

13   M. MARTEL,

14            Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the decision of the California Board

18   of Parole Hearings (hereinafter "Board") to deny him parole for three years at his second

19   subsequent parole consideration hearing held on July 7, 2008.  Upon careful consideration of the

20   record and the applicable law, the undersigned will recommend that petitioner's application for

21   habeas corpus relief be denied.

22                    PROCEDURAL BACKGROUND

23            Petitioner is confined pursuant to a 1987 judgment of conviction entered against

24   him in the Ventura County Superior Court following his conviction on charges of second degree

25   murder with the use of a weapon and burglary.  See In re Birdwell, 50 Cal. App.4th 926 (1996).

26   Pursuant to his conviction for second degree murder, petitioner was sentenced to twenty-two

1

1  years to life in state prison.  (Dkt. 11-1 at 11; Pet. at 78.)[1]

2          Petitioner's second subsequent parole consideration hearing, which is placed at

3  issue by the instant petition, was held on July 7, 2008.  (Pet. at 65.) [2]  At the time of that hearing,

4  petitioner had served approximately seventeen years in prison.  (Id. at 78.)  Petitioner's minimum

5  eligible parole date was June 13, 2000.  (Id.)  At his 2008 hearing the Board panel found

6  petitioner not suitable for parole and denied parole for three years.  (Id. at 197.)

7          It appears from exhibits attached to respondent's answer that on approximately

8  November 4, 2008, petitioner filed a petition for writ of habeas corpus in the Ventura County

9  Superior Court challenging the Board's 2008 decision.  (Dkt. 11-1 at 13-50, 53.)  It also appears

10  that the Superior Court denied that petition in a reasoned decision on the merits.  (Id. at 7.)

11          Petitioner subsequently challenged the Board's 2008 decision in petitions for writ

12  of habeas corpus filed in the California Court of Appeal for the Second Appellate District and in

13  the California Supreme Court.  (Dkt. 11-1 at 1; 11-5 at 2; 11-7 at 2, 3.)  Those petitions were

14  summarily denied.  (Dkt. 11-4 at 2; 11-7 at 2, 3.)

15                          FACTUAL BACKGROUND

16          The Board described the facts of petitioner's commitment offense at the July 7,

17  2008 parole suitability hearing as follows:[3]

18  _____

19    [1]  The jury convicted petitioner of murder and found there were special circumstances in
     that the murder occurred while petitioner was engaged in the commission of robbery and burglary

20  and used a knife in the commission of the offenses.  Id.  However, the jury did not make any
     finding on the verdict form with respect to the degree of murder.  Id.  Petitioner was sentenced to

21  life without the possibility of parole, one of the specified penalties for first degree murder with
     special circumstances.  Because of the defect in the verdict form which resulted in the jury's

22  failure to find the degree of murder, the California Court of Appeal granted petitioner habeas
     relief, vacated the first degree murder conviction and special circumstance findings, reduced the

23  conviction to second degree murder, vacated the judgment, and remanded the matter to the trial
     court for resentencing.  Id. at 931.

24    [2]  Page number citations such as these are to the page number reflected on the court's

25  CM/ECF system and not to page numbers assigned by the parties.

26    [3]  This version of the facts was based on petitioner's description of the events at his 2000
     parole suitability hearing.  (Pet. at 89-90.)

                                            2

Birdwell, when first interviewed, denied he had killed the victim. He remembers drinking all night and walking down the street and the victim stopping to talk to him. The victim told him it would be all right to visit Joyce Jensen and then drove off. When he arrived at the victim's residence, he was invited in. They talked and drank beer. The victim gave him a 50-dollar check and loaned him his mother's car. When he left, the victim was alive. Later on in his statements for the courts, he remembers going to the trailer to visit his mother. From the front door, the victim started yelling obscenities at him to get off his property. During the verbal altercation, Birdwell picked up a piece of wood. The victim talked him into dropping the piece of wood to go into the kitchen to talk. Once in the kitchen, the victim started staring and accusing him of stealing. As he started to leave, the victim jumped him from behind and placed him in a chokehold. He stated, "I flipped out. I had no self-control." He recalled reaching for the . . . knives, but does not recall how the victim's throat became slashed. Birdwell said he forged and cashed the victim's check so that he would have money to leave the area. He ransacked the house to make it look like a burglary and took the wallet and put it in the fish tank, so it would appear like it was a robbery.

(Pet. at 90-91.) Petitioner declined to discuss his commitment offense at the 2008 parole suitability hearing. (Id. at 88.)

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting

habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008). See also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). See also Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005) ("When more than one state court has adjudicated a claim, we analyze the last reasoned decision"). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's

1   claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not

2   apply and a federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052,

3   1056 (9th Cir. 2003).

4   II.  Petitioner's Claims

5            In his first ground for relief, petitioner claims that the Board's 2008 decision

6   finding him unsuitable for parole violated his right to due process.  (Pet. at 4, 34-35.)  He alleges

7   that the Board has improperly continued to rely on the unchanging factors of his commitment

8   offense and juvenile record to find him unsuitable, even though he has never been convicted of

9   any other violent felony.  (Id.)  Petitioner explains that the commitment offense was the result of

10   significant stress in his life "which is not likely to recur."  (Id. at 34.)  He argues that his criminal

11   record is no longer predictive of his current dangerousness.  (Id. at 35.)

12            In his second ground for relief, petitioner claims that the Board's 2008 decision

13   violated the Establishment Clause of the First Amendment because it was improperly based on

14   his refusal to "join and memorize 12-steps of the AA/NA program which involves accepting the

15   'God' concept."  (Id. at 4.)  Petitioner argues that he was denied parole "for not accepting a state

16   compelled religious program."  (Id.)  He states that although the Board told him he was not

17   required to attend AA meetings, "it is clear that petitioner's desire not to work the 12 steps of AA

18   was used as a factor to deny him parole and was made part of that decision."  (Id.)  Petitioner

19   explains that he is an "Asatru/Odinist" and that coerced participation in AA/NA would violate

20   his beliefs.  (Id. at 37.)  He states that because he believed it "would do more harm than good to

21   try and explain this at the hearing," he simply told the Board that "he works the steps."  (Id.)

22            In his third ground for relief, petitioner claims that the Board in 2008 improperly

23   found him unsuitable for parole because he declined to discuss the facts of his crime.  (Id. at 5,

24   38-40.)  Petitioner explains that although he discussed the facts of the crime at all previous

25   hearings and during psychological evaluations, he did not want to talk about the crime in front of

26   his mother, who was present at his 2008 parole suitability hearing.  He also states that he does

5

1   not agree with the Board's theory of how the crime occurred, but believes that if he explains his

2   own theory this "somehow shows a lack of insight or responsibility for the crime." (Id. at 39.)

3   Petitioner argues that the Board's reliance on his refusal to discuss the facts of the crime to find

4   him unsuitable for parole violates various provisions of California law. (Id. at 38-39.)

5          In his fourth ground for relief, petitioner claims that the Board violated his right to

6   due process when it hired its "own psychologist" who was "beholden" to the Board to evaluate

7   him prior to the 2008 parole hearing. (Id. at 5, 40-43.) Petitioner states that he received "'low

8   risk' positive reports" prior to the 2008 suitability hearing, but that the psychologist retained to

9   provide a report for the 2008 hearing "without any intervening factors . . . elevated petitioner's

10  risk assessment from low to moderate." (Id. at 40.) He argues that the Board's retention of

11  biased psychiatrists is "a masked effort to justify, with 'new evidence' . . . the Board's

12  continuous denial of parole to prisoners who have served their time long after minimum eligible

13  release dates, as is the case here." (Id.) Essentially, petitioner is arguing that the Board is

14  engaging in an improper practice of obtaining psychological reports from those who are under its

15  control to justify finding prisoners unsuitable for parole. Petitioner also contends that the 2008

16  psychological report contained factual inaccuracies which rendered it unreliable. (Id. at 42.)

17         In his fifth ground for relief, petitioner claims that the Board members, who are all

18  "ex-law enforcement, or professional victims' rights advocates" do not represent a cross-section

19  of the community and cannot conduct a fair suitability hearing, in violation of his rights under

20  state law and the federal due process clause. (Id. at 6, 46-48.) Petitioner contends that "the BPH

21  has turned into a 'crime fighting' forum influenced by politics, rather than an impartial panel that

22  determines 'current dangerousness' before it 'normally sets parole release dates.'" (Id. at 46.)

23         In his sixth ground for relief, petitioner claims that the Board improperly based its

24  2008 decision on his "vague" parole plans even though he demonstrated that he had marketable

25  skills, a place to live and a job offer. (Id. at 6.) Petitioner contends that the Board found his

26  parole plans inadequate on the inappropriate ground that he did not describe his intended place of

1  residence and prospective job in adequate detail.  (Id. at 6, 48-49.)

2          In his seventh ground for relief, petitioner claims that he was denied parole

3  because of political pressure from "the Governor's Office" not to grant parole to life prisoners, in

4  violation of his right to due process.  (Id. at 7, 50-51.)  He states that commissioners who "set too

5  many parole dates are asked to leave or are terminated."  (Id. at 7.)  Petitioner states, "[a] Board

6  commissioner cannot be impartial and do their job if they must choose between a job at 100K or

7  releasing an inmate."  (Id. at 51.)

8          In his eighth ground for relief, petitioner claims that the Board improperly denied

9  him parole based on non-violent disciplinary convictions which do not establish that he is

10  currently dangerous.  (Id. at 7, 43-45.)  Petitioner informs that court that he has never been

11  charged with a felony or misdemeanor while in prison, served a term in the Security Housing

12  Unit, or become involved with prison gangs or drugs.  (Id. at 44.)  Petitioner argues that denying

13  him parole for three years for a disciplinary conviction that would result in only a 30-day credit

14  loss to inmates who are not seeking parole, violates his right to equal protection of the laws.  (Id.)

15          In the points and authorities attached to his petition, petitioner raises an

16  additional, ninth, ground for relief.  Therein, he argues that the Board improperly denied him

17  parole based on photographs of his artwork that he brought to the 2008 parole hearing to support

18  his assertion that he had talent as an artist and wished to establish a graphics company.  (Id. at

19  49.)  Petitioner contends the Board wrongly interpreted his photographs as demonstrating that he

20  had "unresolved anger issues."  (Id.)  He argues the Board was not qualified to make such an

21  assessment and that the artwork had no bearing on whether he posed a current danger to society

22  because it was created for someone else based on their description of what they wanted.  (Id. at

23  50.)

24          A.  Due Process

25          Petitioner's first, third, fourth, sixth, eighth and ninth grounds for relief all

26  challenge the Board's 2008 denial of parole as a violation of due process on the basis that the

Board's decision was not supported by "some evidence" in the record.  Below, these claims will be addressed together as a single due process claim.

### 1. Due Process in the California Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A litigant alleging a due process violation must first demonstrate that he was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).[4]

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution "by reason of guarantees implicit in the word 'liberty,'" or from "an expectation or interest created by state laws or policies."  Wilkinson v. Austin,  545 U.S. 209, 221 (2005) (citations omitted).  See also Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981); Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 7 (1979) (There is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."; see also Hayward v. Marshall, 603 F.3d 546, 561 (9th Cir. 2010) ("[I]n the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the absence of 'some evidence' of future dangerousness or anything else.") (en banc).

---

[4]  In the context of parole proceedings, the "full panoply of rights" afforded to criminal defendants is not "constitutionally mandated" under the federal Due Process Clause.  Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (internal quotations and citation omitted).  The United States Supreme Court has held that due process is satisfied in the context of a hearing to set a parole date where a prisoner is afforded notice of the hearing, an opportunity to be heard and, if parole is denied, a statement of the reasons for the denial.  Hayward v. Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (en banc) (quoting Greenholtz, 442 U.S. at 16).  See also Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (describing the procedural process due in cases involving parole issues).

1   However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

2   parole release will be granted' when or unless certain designated findings are made, and thereby

3   gives rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz,

4   442 U.S. at 12). See also Allen, 482 U.S. at 376-78; Pearson v. Muntz, 606 F.3d 606, 609 (9th

5   Cir. 2010) ("The principle that state law gives rise to liberty interests that may be enforced as a

6   matter of federal law is long established."); Hayward, 603 F.3d 562-63 ("Although the Due

7   Process Clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of

8   future dangerousness, state law may supply a predicate for that conclusion.")

9           In California, a prisoner is entitled to release on parole unless there is "some

10  evidence" of his or her current dangerousness. Hayward, 603 F.3d at 562 (citing In re Lawrence,

11  44 Cal.4th 1181, 1205-06, 1210 (2008) and In re Shaputis, 44 Cal. 4th 1241 (2008)); Cooke v.

12  Solis, 606 F.3d 1206, 1213 (9th Cir. 2010), pet. for cert. filed (Sept. 2, 2010) (No. 10-333); Pirtle

13  v. California Bd. of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ; In re Rosenkrantz, 29

14  Cal.4th 616, 651-53 (2002). Therefore, "California's parole scheme gives rise to a cognizable

15  liberty interest in release on parole." Pirtle, 611 F.3d at 1020 (quoting McQuillion, 306 F.3d at

16  902). This liberty interest is enforceable under the federal Due Process Clause pursuant to

17  clearly established federal law. Haggard v. Curry, 623 F.3d 1035, 1040-41 (9th Cir. 2010);

18  Cooke, 606 F.3d at 1213 (denial of parole to a California prisoner "in the absence of 'some

19  evidence' of current dangerousness . . . violat[es] . . . his federal right to due process."); Pearson,

20  606 F.3d at 609 (a state parole system that gives rise to a liberty interest in parole release is

21  enforceable under the federal Due Process Clause); Hayward, 603 F.3d at 563; see also Castelan

22  v. Campbell, No. 2:06-cv-01906-MMM, 2010 WL 3834838, at * 2 (E.D. Cal. Sept. 30, 2010)

23  (McKeown, J.) ("In other words, in requiring [federal] habeas courts to review parole denials for

24  compliance with California's 'some evidence' rule, Hayward holds that California state

25  constitutional law creates a cognizable interest in parole absent 'some evidence' of

26  dangerousness, and that the federal Due Process Clause in turn incorporates that right as a matter

9

1   of clearly established federal law.")

2              2. <u>California's Statutes and Regulations on Parole</u>

3            When a federal court assesses whether a state parole board's suitability

4   determination was supported by "some evidence" in a habeas case, that analysis "is shaped by the

5   state regulatory, statutory, and constitutional law that governs parole suitability determinations in

6   California." <u>Pirtle</u>, 611 F.3d at 1020 (citing <u>Hayward</u>, 603 F.3d at 561-62).   The setting of a

7   parole date for a California state prisoner is conditioned on a finding of suitability.  Cal. Penal

8   Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402.  The state regulation that governs parole

9   suitability findings for life prisoners states as follows with regard to the statutory requirement of

10   California Penal Code § 3041(b):  "Regardless of the length of time served, a life prisoner shall

11   be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

12   an unreasonable risk of danger to society if released from prison."  Cal. Code Regs. tit. 15, §

13   2281(a).  In California, the overriding concern in determining parole suitability is public safety.

14   <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1086 (2005).  This "core determination of 'public safety' . . .

15   involves an assessment of an inmates *current* dangerousness."  <u>In re Lawrence</u>, 44  Cal. 4th at

16   1205 (emphasis in original).  Accordingly,

17
18            when a court reviews a decision of the Board or the Governor, the
             relevant inquiry is whether some evidence supports the decision of
             the Board or the Governor that the inmate constitutes a current
             threat to public safety, and not merely whether some evidence
19            confirms the existence of certain factual findings.

20   <u>Id</u>. at 1212 (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th at 658; <u>In re Dannenberg</u>, 34 Cal. 4th at 1071;

21   and <u>In re Lee</u>, 143 Cal. App.4th 1400, 1408 (2006)).  "In short, 'some evidence' of future

22   dangerousness is indeed a state *sine qua non* for denial of parole in California."  <u>Pirtle</u>, 611 F.3d

23   /////

24   /////

25   /////

26   /////

1  at 1021 (quoting Hayward, 603 F.3d at 562).  See also Cooke, 606 F.3d at 1214.[5]

2         Under California law, prisoners serving indeterminate prison sentences "may

3  serve up to life in prison, but they become eligible for parole consideration after serving

4  minimum terms of confinement."  In re Dannenberg, 34 Cal. 4th at 1078.  The Board normally

5  sets a parole release date one year prior to the inmate's minimum eligible parole release date, and

6  does so "in a manner that will provide uniform terms for offenses of similar gravity and

7  magnitude in respect to their threat to the public."  In re Lawrence, 44 Cal. 4th at 1202 (citing

8  Cal. Penal Code § 3041(a)).  A release date must be set "unless [the Board] determines that the

9  gravity of the current convicted offense or offenses, or the timing and gravity of current or past

10  convicted offense or offenses, is such that consideration of the public safety requires a more

11  lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ."  Cal.

12  Penal Code § 3041(b).  In determining whether an inmate is suitable for parole, the Board must

13  consider all relevant, reliable information available regarding

14  
15  
16  
17  
18  
> the circumstances of the prisoner's social history; past and present
> mental state; past criminal history, including involvement in other
> criminal misconduct which is reliably documented; the base and
> other commitment offenses, including behavior before, during and
> after the crime; past and present attitude toward the crime; any
> conditions of treatment or control, including the use of special
> conditions under which the prisoner may safely be released to the
> community; and any other information which bears on the
> prisoner's suitability for release.

19  Cal. Code Regs., tit. 15, § 2281(b).  However, "there must be more than the crime or its

20  

21  
22  
23  
24  
25  
> [5] As the Ninth Circuit has explained, the "some evidence"
>
> requirement imposes substantive rather than purely procedural
> constraints on state officials' discretion to grant or deny parole: "a
> reviewing court . . . is not bound to affirm a parole decision merely
> because the Board or the Governor has adhered to all procedural
> safeguards."  In re Lawrence, 44 Cal.4th [at 1210].   Rather the
> court must ensure that the decision to deny parole is "supported by
> some evidence, not merely by a hunch or intuition."  Id. [at 1212].

26  Cooke, 606 F.3d at 1213-14.

1    circumstances alone to justify the Board's or the Governor's finding of current dangerousness."

2    Cooke, 606 F.3d at 1214.  See also Lawrence, 44 Cal. 4th at 1211 ("But the statutory and

3    regulatory mandate to normally grant parole to life prisoners who have committed murder means

4    that, particularly after these prisoners have served their suggested base terms, the underlying

5    circumstances of the commitment offense alone rarely will provide a valid basis for denying

6    parole when there is strong evidence of rehabilitation and no other evidence of current

7    dangerousness."); McCullough v. Kane, ___F.3d___, 2010 WL 5263140, at *6 (9th Cir. Dec. 27,

8    2010) (affirming a grant of habeas relief upon finding that due process was violated by "reliance

9    upon the immutable and unchanging circumstances of [the] commitment offense[.]")

10         The regulation identifies circumstances that tend to show suitability or

11   unsuitability for release.  Cal. Code Regs., tit. 15, § 2281(c) & (d).  The following circumstances

12   are identified as tending to show that a prisoner is suitable for release:  the prisoner has no

13   juvenile record of assaulting others or committing crimes with a potential of personal harm to

14   victims; the prisoner has experienced reasonably stable relationships with others; the prisoner has

15   performed acts that tend to indicate the presence of remorse or has given indications that he

16   understands the nature and magnitude of his offense; the prisoner committed his crime as the

17   result of significant stress in his life; the prisoner's criminal behavior resulted from having been

18   victimized by battered women syndrome; the prisoner lacks a significant history of violent crime;

19   the prisoner's present age reduces the probability of recidivism; the prisoner has made realistic

20   plans for release or has developed marketable skills that can be put to use upon release;

21   institutional activities indicate an enhanced ability to function within the law upon release.  Id., §

22   2281(d).

23         The following circumstances are identified as tending to indicate unsuitability for

24   release:  the prisoner committed the offense in an especially heinous, atrocious, or cruel manner;

25   the prisoner had a previous record of violence; the prisoner has an unstable social history; the

26   prisoner's crime was a sadistic sexual offense; the prisoner had a lengthy history of severe mental

1    problems related to the offense; the prisoner has engaged in serious misconduct in prison.  Id., §

2    2281(c).  Factors to consider in deciding whether the prisoner's offense was committed in an

3    especially heinous, atrocious, or cruel manner include:  multiple victims were attacked, injured,

4    or killed in the same or separate incidents; the offense was carried out in a dispassionate and

5    calculated manner, such as an execution-style murder; the victim was abused, defiled or

6    mutilated during or after the offense; the offense was carried out in a manner that demonstrated

7    an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable

8    or very trivial in relation to the offense.  Id., § 2281(c)(1)(A) - (E).

9            In the end, under state law as clarified by the California Supreme Court,

10           the determination whether an inmate poses a current danger is not
             dependent upon whether his or her commitment offense is more or
11           less egregious than other, similar crimes.  (*Dannenberg, supra*, 34
             Cal. 4th at pp 1083-84 [parallel citations omitted].)  Nor is it
12           dependent solely upon whether the circumstances of the offense
             exhibit viciousness above the minimum elements required for
13           conviction of that offense.  Rather, the relevant inquiry is whether
             the circumstances of the commitment offense, when considered in
14           light of other facts in the record, are such that they continue to be
             predictive of current dangerousness many years after commission
15           of the offense.  This inquiry is, by necessity and by statutory
             mandate, an individualized one, and cannot be undertaken simply
16           by examining the circumstances of the crime in isolation, without
             consideration of the passage of time or the attendant changes in the
17           inmate's psychological or mental attitude. [citations omitted].

18   In re Lawrence, 44 Cal. 4th at 1221.  See also In re Shaputis, 44 Cal. 4th at 154-55.

19           In this federal habeas action challenging the denial of release on parole it is the

20   court's task to determine "whether the California judicial decision approving the governor's [or

21   the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some

22   evidence' requirement, or was 'based on an unreasonable determination of the facts in light of

23   the evidence.'"  Hayward, 603 F.3d at 563.  See also Pearson, 606 F.3d at 609 ("Hayward

24   specifically commands federal courts to examine the reasonableness of the state court's

25   determination of facts in light of the evidence.");  Cooke, 606 F.3d at 1213; McCullough, 2010

26   WL 5263140, at *4.  Accordingly, below the court considers whether the Board's decision to

13

1   deny parole in this case constituted an unreasonable application of the "some evidence" rule.

2       3.  Analysis

3           In addressing the factors it considered in reaching its 2008 decision that petitioner

4   was unsuitable for parole, the Board in this case stated as follows:

5           PRESIDING COMMISSIONER BRYSON: . . . Sir, the Panel
            reviewed all information received from the public and from you
6           and relied on the following circumstances in concluding that you
            are not yet suitable for parole and would pose an unreasonable risk
7           of danger to society or a threat to public safety if released from
            prison.  This offense was carried out in an especially heinous,
8           cruel, and callous manner in that on the night of October 5th, 1986,
            the victim Douglas Leroy Jenson, a 41-year-old male, was
9           particularly vulnerable, as he had been drinking at a local bar with
            friends.  It was early morning.  He was in his own home and he
10          was married to your mother, and his blood alcohol level was .24
            percent, meaning he was substantially mentally and physically
11          impaired at the time of your attack.

12          "Entering the victim's residence at approximately 0600, Ms.
            Jensen stumbled over a two by four, found the home in disarray,
13          and the victim dead in the kitchen lying on his back in a pool of
            blood next to some sheets.  Reports indicated blood found in the
14          victim's home was consistent with an attack in the hallway,
            progressing to the living room, and ending in the center of the
15          kitchen floor where the victim died."

16          This offense was carried out in a dispassionate manner.  The blood
            evidence did not indicate a fight that started in the kitchen.  An
17          acquaintance of the inmate, that is you, sir, reported they had
            visited her the evening before, and when asked about a wig that
18          you had borrowed, you said you needed it to rob someone.  This
            victim was abused and mutilated during this offense.
19
            "An autopsy performed on the victim revealed that he had 16 major
20          stab wounds.  Thirteen of these wounds were on the victim's back
            and some went into the body as deep as seven inches.  At least half
21          of the wounds to the back had penetrated the victim's chest and
            abdominal cavities and punctured his lungs.  Some of these
22          wounds also punctured his liver.  It was determined that several
            kitchen knives had been used on the victim.  Since these knives
23          were only moderately sharp, substantial force and brutality was
            necessary to cause the victim's wounds.  The victim also had
24          abrasions and bruises on his face.  The abrasions were consistent
            with blows from a two by four wooden board, by a fist, and by the
25          victim's face hitting a wall.  The victim's throat was slit.  The
            jaggedness and depth of the cut, which severed the victim's jugular
26          vein, larynx, and the back of his throat, indicated that the wound

was produced by a sawing motion requiring a large amount of effort and at least three separate movements of the knife.  The victim also had stab wounds on his hands, which were produced by defensively holding up his palms.  One of these wounds went through his palm to the other side of this hand and grazed his wrist.  The victim received all of his injuries before he died.  The neck cut was most likely the last wound inflicted due to the amount of blood and proximity of blood on the floor.  The victim was at least 100 pounds heavier than the inmate, and the difference in the size between the inmate and the victim suggests that the victim may [sic] lying on the floor when the neck cut was made."

Sir, testimony today and prior times indicated that the relationship between you and victim was acrimonious, and the victim had previously warned you not to enter his home.  You lied initially to police claiming you did not commit the murder, and that when you left the residence early in the morning, Jensen was still alive.  That, of course, is historically wrong.  This offense was carried out in a manner demonstrating callous disregard for human suffering.  The Panel noted that, despite your claims of self-defense in this crime, you inflicted 13 major stab wounds to Jensen's back. The motive for this crime was simply inexplicable.  Stolen from the victim's residence were a videocassette recorder, a 35-millimeter camera, lenses, case, tripod, savings account book, enlarger, computer, printer, keys, and the victim's mother's vehicle.  You then, sir, forged and cashed after this murder a 50-dollar check from the victim's account in order to flee the area.  You do have a history, sir, of violence, assaults, and prior criminality showing an escalating pattern of criminal conduct.  You did have a tumultuous childhood.  That's very unfortunate, but your escalating pattern of criminal conduct is the problem that we have here today that we're still dealing with.  You have juvenile probation that you suffered, juvenile parole, and adult probation.  You were discharged and did serve out your parole from CYA, and you were also – you also suffered camp time, so you did have a tumultuous childhood.  You indicated today that you were a runaway; that you lived on the streets, that you started alcohol, and then drugs at the age of 13, and then commenced and continued with marijuana.  You also indicated that you were involved with cocaine as well as other drugs.  Your institutional behavior has been mixed.  You're a very good worker.  That's clear.  You have vocational welding.  You have your American Welding certificate, and you did achieve your GED.  You've achieved your vocational Office Services and Related Technologies.  You appear to be putting that to good use.  It appears that you have always worked.  Your self-help, however, is lacking.  You have done substance abuse study in the past, and you've been part of the Victims Awareness Offenders Program, but you haven't been doing much in the way of self-help recently.  And when questioned about AA/NA, even after you said that you're an alcoholic, you said, well, I'm not an avid AA follower.  That's what it came down to.  And basically, you eschewed . . . that

15

basically you hand waived the idea of the 12-Steps indicating that you didn't memorize them.  But, sir, the 12-Steps this Panel would like you to note or some program similar to that.  It's not required that you do AA.  Some religions prohibit some inmates from doing AA.  But the idea is that you need tools to be able to use on the outside, and if you internalize a program, it's not that hard.  We're looking at 12 steps, sir, and 11 years basically and we're weighing that.  We're 12 steps over here on the one hand, 11 years on the other hand.  If you internalize the principles, the Panel would expect that you could discuss what tools you will have to keep you from recidivating on the outside.  And that's one of the things that the psychological evaluations do point to; that there are potential issues there only because that's reality.  Many people do recidivate.  Even people who come in, sit down, and say I'm never going to take drugs or drink again, they do recidivate because they don't have a plan in place.  Just saying I'm not going to do it is not enough, and you really haven't got that program in place or a prevention plan in place.  You've been part of the lifer groups.  You've obviously – You're helping inmates with their habeas corpuses.  Good for you.  The issue, though, is you need to work very hard on what it's going to take to get you suitable for parole.  You also are an artist it's clear, and you have potential there, and you showed some of the – of your artwork.  Some of your artwork does reflect, sir, some anger, and some ideas that we just – We were astounded by some of the artwork that we saw.  It's very good –

INMATE BIRDWELL: Thank you.

PRESIDING COMMISSIONER BRYSON:  – quality, but some of the artwork that you have is very interesting.  And the last Panel suggested that you take an anger management group or that you get involved in some self-help having to do with anger management.  And that's something that the way you present today may potentially be of benefit to you.  This Panel would reiterate what that Panel did suggest to you.  So a substance abuse plan and some anger management or other self-study would be a good idea for you, and in fact when you don't have classes available, sir, or you're busy with work and you have – don't have time to participate in particular classes, reading is always available and you can come and bring book reports to this Panel as to what you have read.  You do, sir, have serious disciplinary violations.  You have 11 of them, and you've had two since the last hearing.  You brushed those off today.  You say, well, basically they're not – that they're not violent.  You indicated in that, therefore, this Panel should not take them into great weight.  We put great weight on 115s, sir, and you've been here in the institution and in all institutions throughout the State of California where you have been incarcerated to know that any Panel is going to look very seriously at your 115 record and you minimized those 115s today.  I think that's important that you take another look at what your thinking is

in that regard.  You do have a 115 history that's serious, and we have to take that into account.  So you've continued to display negative behavior in prison until quite recently, and that hampers your parole readiness as well.  As to the psychological report dated May 5th of 2008, by Dr. Steven Baron, Dr. Baron diagnosed you on Axis I with Alcohol Dependence Without Physiological Dependence in a Controlled Environment.  He also diagnosed you with Polysubstance Dependence Without Physiological Dependence in a Controlled Environment.  He also diagnosed you on Axis with Antisocial Personality Disorder and gave you a Global Assessment of Functioning of 75.  Sir, the Panel did note several of the comments that you made about the psychological report today and they were well taken and well received.  Of concern to this Panel is your description of this institution as really petty, and when asked to further explain that, you did.  And compared to some of the violence that occurs, as you put it, on the mainline, some of the offenses that you describe in here perhaps in your mind don't amount to the same level of concern, but I will tell you, sir, they do because in fact you are in a prison where fortunately you don't have the same type of violence as frequently displayed as perhaps you were experiencing in other institutions. So possession of a razorblade, you said it was used for your hobby and it was basically nothing.  Sir, it's a weapon or it could be a weapon and so it's a serious – it's a serious RVR, sir.  And we feel that, in fact, that you should be taking this seriously.  You also minimized your response; you said that the psychological evaluation was taken out of context on the issue of fighting.  That's an important issue for you, sir.  And the reason is that, yes, your crime will never change, and you are in some way in your affect today complaining about the fact that we are addressing that crime, but first of all, sir, we have to look at the record.  It's your right not to discuss the crime, but then we're left with what's on the record to represent your understanding of the nature and magnitude of this crime.  And it's clear that by now you probably do understand the magnitude of this crime because you've been serving the time, but if you understand the nature of it is the concern.  This was such a vicious crime.  It exceeded – It far exceeded the minimum requirement for a murder second and I hope you understand that, sir, because it certainly did.  That's why I went to the trouble to read it into the record, not because I enjoyed that; that's very hard to read; but because in fact it was an extremely egregious crime. And the question arises, what were you thinking?  What was in you that allowed you to cross that line so far that you not only took a person's life but you wreaked havoc upon the body of that person. That is very concerning to this Panel, sir, that you did that in such a way.  And you don't appear to have anywhere in the material that we have available, you haven't addressed that issue because that's what's of concern to us.  We understand that that crime will never change, but we want you to explain to this Board and show this Board in some way that you have the understanding of what was going on with you at that time because only then can you truly

17

change and give the Panel assurance that you're not going to go out and be in any way vicious again and hurt somebody.  You're perfectly capable still today of hurting someone and that's the issue.  The instruments that were used – psychometric instruments that were used to determine your potential for both recidivating and violence included the PCL-R and you ranked in the moderate range.  And the doctor noted:  "The presence of antisocial attitudes and behavior including impulsivity, aggressiveness, and lack of empathy appear to have influenced his previous violent behavior particularly during the crime.  It's also noteworthy that Mr. Birdwell had a history of physical violence with the victim prior to the crime, as well as a history of domestic violence with his wife." Now, sir, we do understand what you've represented today to this Panel with regard to your wife, but that was very concerning to us because you had a lot of evidence as a young man and boy of domestic violence in your home, and the statistics show that in fact that is often passed on to progeny.  So we were concerned about what you would say, but you commented that your wife wanted to run everything and you indicated at one point that you slapped her but, no, you never did domestic violence.  You said in the next sentence that you don't believe in being violent with women, so that was concerning and it apparently was of concern to the clinician as well.  The clinician goes on: "Unstable income and lack of steady employment also appear related to violent behavior as Mr. Birdwell has a history of supporting himself through crime and stole from the victim in controlling offense after his death." Overall, the clinician summed up your current risk for future violence if paroled to the community at this time as being in the moderated range.  As to your parole plans, you do have support letters, sir.  You had family here today who advocated for you. You did not, however, present document viable residential plans for whatever reason.  You're representing that your sister, Christie Underwood, would provide a home for you.  It's important to document these things, sir because we could be –

INMATE BIRDWELL: She wrote a letter.  She represented it, not me.

PRESIDING COMMISSIONER BRYSON: All right.  I stand corrected.  That was the letter that we were given.

DEPUTY COMMISSION MAHONEY: They, though, didn't give any specifics.

PRESIDING COMMISSIONER BRYSON: It was vague?

DEPUTY COMMISSIONER MAHONEY: It just said – It didn't go into the kind of house it was, who was living there, where it is, any of that stuff.

/////

1   PRESIDING COMMISSIONER BRYSON: That is true, and I
    stand corrected on that.  Christie's letter did – That's right.  That
2   did come in.  As to your employment plans, again, you're
    representing them as being working for your brother-in-law.  You
3   need to firm up your employment plans, sir, and you do have
    marketable skills.  Your dream is to have a graphic arts company
4   for yourself, but you appear to be practical in that you're a certified
    welder and that's what you would first do.  You said that you are
5   writing for places to attend AA or formulate some sort of relapse
    prevention plan, but you didn't present that to the Board and that
6   would be important that you do.  Whatever county you wish to
    reside and work, everything has to tie together because on the street
7   that's one of the things that went wrong with your life.  You didn't
    have a job.  You didn't have any – You weren't taking any
8   responsibility at the time, and you didn't have any income.  And so
    basically, things went downhill in a hurry for you.  As to Penal
9   Code 3042 responses, responses indicated opposition to finding of
    parole suitability, specifically by the District Attorney of Ventura
10  County.  In a separate decision, the Hearing Panel finds it is not
    reasonable to expect that parole would be granted at a hearing
11  during the following three years.  The specific reasons for this
    finding are as follows: This offense was carried out especially
12  heinously, cruelly, and callously, and the Panel does incorporate by
    reference the appellate court decision of March 23rd, 1998, pages 3
13  through 4, and the description of the crime.  This offense was
    carried out in a manner demonstrating exceptionally callous
14  disregard for human suffering and, sir, you had clear opportunity to
    cease.  You should never have gone – would never have had to go
15  in that house in the first place.  The motive for this crime remains
    inexplicable to this Panel because of its viciousness.  You stole
16  from the victim afterwards and you forged a check in order to flee
    the area.  And, sir, you are continuing to minimize your criminal
17  history, your involvement in crime - in this crime, and the
    disciplinaries that you've received in prison, which we take very
18  seriously.  You also do need to participate in self-help and you do
    need to firm up your parole plans.  Sir, we're giving you time to do
19  that.  I hope you will come a little better prepared to the next
    hearing.  And I'd like to ask, Commissioner Gillingham, do you
20  have any remarks?

21  COMMISSIONER GILLINGHAM: Not at this time.

22  PRESIDING COMMISSIONER BRYSON: All right.  And,
    Commissioner Mahoney, do you have any remarks?
23
    DEPUTY COMMISSIONER MAHONEY: Just to reiterate, if you
24  want to get out of here, you really need to – you're going to have to
    upgrade a lot self-help-wise.  And I would definitely recommend
25  taking anger management.  The last Board recommended it and
    you didn't do it, and stay away from those 115s.

26  /////

19

INMATE BIRDWELL: I was under the impression that marketable skills was the prerequisite, not actual employment, although actual employment helps, which my brother-in-law said he would help me with.  But it's my understanding that having marketable skills is the regulatory requirement.

PRESIDING COMMISSIONER BRYSON: And you do have marketable skills, sir, and that is the law; that you have to have marketable skills and that is the barebones minimum.  The recommendation that the Commissioner is making to you is that you – We see many prisoners come in with job offers, job plans, and specific job plans, and it just – it helps you a lot to do that.  You do have marketable skills.  There's no doubt about that and I said that.

INMATE BIRDWELL: And I'd like to say one thing, too.  When you say that I minimize my past criminal history –

PRESIDING COMMISSIONER BRYSON: Sir, I'm sorry.  We're not going to discuss any of that now.  That's how it appeared.  I recommend, sir, that you take the transcript and read it over.  That concludes this hearing and the time is now 1622, and the prisoner can be taken out, please.

(Pet. at 182-97.)

After taking into consideration relevant law, and for the reasons set forth below, this court concludes that petitioner is not entitled to federal habeas relief with respect to his due process challenge to the Board's July 7, 2008 decision denying him parole.  For the reasons set forth in detail below, the Board's decision that petitioner was unsuitable for parole at that time and that his release would unreasonably endanger public safety was supported by "some evidence" that bore "indicia of reliability."  Jancsek, 833 F.2d at 1390.

One of the factors relied on by the Board in 2008 to find petitioner unsuitable for parole was the unchanging circumstances of his crime of conviction.  According to the decisions discussed above, the commitment offense can constitute "some evidence" to support the Board's unsuitability finding only as long as it is still relevant to a determination of the prisoner's current dangerousness.  Specifically, "the circumstances of a commitment offense cannot constitute evidentiary support for the denial of parole 'unless the record also establishes that something in the prisoner's pre-or post-incarceration history, or his or her current demeanor and mental state,

1   indicates that the implications regarding the prisoner's dangerousness that derive from his or her

2   commission of the commitment offense remain probative to the statutory determination of a

3   continuing threat to public safety.'" <u>Cooke</u>, 606 F.3d at 1216 (citing <u>Lawrence</u>, 44 Cal.4th at

4   1214).  <u>See also</u> <u>McCullough</u>, 2010 WL 5263140, at *6  (Ninth Circuit affirming the grant of

5   habeas relief where due process was violated by "reliance upon the immutable and unchanging

6   circumstances of [the] commitment offense" in the parole denial).  Here, in finding petitioner

7   unsuitable for parole, the Board members relied, in part, on petitioner's recent failure to obtain

8   self-help, either through an established program or through self-study, in order to address his

9   problems with alcohol and anger and their effect on the crime of commitment.  The Board also

10  relied on petitioner's recent psychological evaluation, in which the psychologist opined that

11  petitioner posed a moderate danger to society if released, and petitioner's prison disciplinary

12  convictions, which included recent convictions for possession of a razor blade and failure to obey

13  an order.[6]  These pre and post-conviction factors support the Board's finding in 2008 that the

14  circumstances of petitioner's commitment offense remained probative of his current

15  dangerousness at that time, notwithstanding the positive strides petitioner had made while

16  incarcerated.

17  _____

18      [6]  In his pending petition, petitioner explains that he was given the razor blade "as part of
    his duties in Arts & Corrections for cutting canvas," and that it was not altered from its original
19  state when it was found in his possession. (Pet. at 44.)  He argues that, under these
    circumstances, his disciplinary conviction for possession of the razor blade does not provide
20  evidence that he was currently dangerous.  (<u>Id.</u>)  Petitioner also explains that his disciplinary
    conviction for refusing to obey an order had no bearing on whether he was currently dangerous
21  because it "involved one staff member instructing petitioner to locate to one area that another
    staff member instructs to the contrary, ambuscaded petitioner into a non-compliable situation
22  which is mitigated by petitioner's confusion from only being awake for a half hour." (<u>Id.</u> at 45.)
    These arguments do not entitle petitioner to habeas relief.  This court may not reweigh the
23  evidence upon which petitioner's disciplinary convictions were based in this habeas corpus
    proceeding.  Petitioner is also not entitled to relief with respect to his claim that denying him
24  parole for three years for a disciplinary conviction that would only result in a 30-day credit loss
    to inmates not seeking parole, violates his right to equal protection.  Petitioner is not similarly
25  situated to prisoners who are not seeking a parole date.  <u>See</u> <u>McGinnis v. Royster</u>, 410 U.S. 263,
    269-70 (1973) (a petitioner raising an equal protection claim in the parole context must
26  demonstrate that he was treated differently from other similarly situated prisoners and that the
    Board lacked a rational basis for its decision).

1    Petitioner has submitted no evidence to support his claim that the psychologist

2 who prepared the report relied on by the Board in 2008 was biased against him, beholden to the

3 Board, or unable to render a competent opinion.  There is also no evidence before this court that

4 the psychological evaluation was written in support of any particular political agenda.  Nor does

5 petitioner's argument that the Board improperly relied on his artwork to find that he had anger

6 management issues entitle him to relief.  Apparently, a previous Board panel suggested that

7 petitioner become involved in self-help in order to address his problems with anger management.

8 Petitioner provided no evidence at his 2008 suitability hearing that he had complied with this

9 suggestion.  There is no evidence that the content of petitioner's artwork played a significant part

10 in the Board's 2008 decision to deny him parole.

11    One Board member raised petitioner's refusal to discuss the commitment offense

12 and informed petitioner that the Board was concerned about his failure to explain what was in his

13 mind at the time of the killing.  (See Pet. at 191.)  California regulations provide that when

14 appearing before the Board, an inmate "may refuse to discuss the facts of the crime in which

15 instance a decision shall be made based on the other information available and the refusal shall

16 not be held against the prisoner."  Cal. Code Regs., tit. 15, § 2236.  See also In re Palermo, 171

17 Cal. App. 4th 1096, 1110-1111 (2009) (Board's denial of parole reversed where court was not

18 persuaded that the Board's concerns about inmate's insight were not an indirect requirement that

19 he admit guilt of the charged crime).  Here, the presiding commissioner told petitioner that it was

20 his right "not to discuss the crime," but that his silence left only the record to explain petitioner's

21 motivations and whether he understood the magnitude of what he had done.  (Pet. at 190-91.)

22 Even assuming arguendo that the Board improperly relied, in part, on petitioner's failure to

23 discuss the crime in finding him unsuitable for parole, the other factors that formed the basis of

24 the Board's decision, described above, constitute "some evidence" supporting the Board's

25 decision that petitioner in 2008 remained a danger to public safety.

26 /////

1    In sum, the decision of the California courts that petitioner's right to due process

2 was not violated by the Board's 2008 decision finding him unsuitable for parole, in light of the

3 evidence and factors outlined above, is not contrary to or an unreasonable application of federal

4 law as set forth herein.  Petitioner is therefore not entitled to federal habeas relief with respect to

5 his due process claims.

6    B.  First Amendment Claim (second ground for relief)

7    As discussed above, petitioner also claims that the Board's denial of parole

8 violated his rights under the Establishment Clause of the First Amendment because it was based,

9 in part, on his failure to attend Alcoholics Anonymous or Narcotic Anonymous, which are faith-

10 based programs.

11    "It is beyond dispute that, at a minimum, the Constitution guarantees that

12 government may not coerce anyone to support or participate in religion, or its exercise . . . ." Lee

13 v. Weisman, 505 U.S. 577, 587 (1992).  In Inouye v. Kemna, 504 F.3d 705, 713 n.7 (9th Cir.

14 2007), the Ninth Circuit adopted a three part inquiry for determining whether there has been

15 governmental coercion of religious activity.  Those inquiries are: (1) has the state acted; (2) does

16 the state action amount to coercion; and (3) is the object of the coercion religious rather than

17 secular?  504 F.3d at 713.  In the parole suitability context, the first element of the Inouye

18 coercion test is satisfied if the Board expressly states that the prisoner must participate in the

19 faith-based program at issue.[7]  Turner v. Hickman, 342 F. Supp.2d 887, 894-95 (E.D. Cal. 2004)

20 (applying "coercion test" to § 1983 action alleging inmates were required to participate in a

21 faith-based treatment program as a condition for release on parole).  The second element is met if

22 the Board advises the prisoner he will not be eligible for parole unless he participates in the

23 particular faith-based program.  Id. at 896.

24

25    [7]  Programs such as AA and NA are "fundamentally religious" within the meaning of the
26 third element of the coercion test.  Turner v. Hickman, 342 F. Supp.2d 887, 896-97 (E.D. Cal.
2004).

23

1    Petitioner has failed to meet the first and second tests described above.  Although

2  the Board panel presiding over petitioner's 2008 suitability hearing discussed the sufficiency of

3  his participation in substance abuse programming, the panel did not indicate that petitioner was

4  required to participate in AA, NA, or any other faith based substance abuse program in order to

5  be found suitable for parole.  On the contrary, the presiding commissioner expressly informed

6  petitioner that "[i]t's not required that you do AA," and that "some religions prohibit some

7  inmates from doing AA."  (Pet. at 187.)  Cf. Turner, 342 F. Supp.2d at 891-92 (the Inouye

8  "coercion test" for proving a First Amendment violation is satisfied where a panel member

9  advised prisoner that his participation in NA was a "mandatory" prerequisite to the Board's

10  parole suitability determination).  Moreover, petitioner never expressed to the Board that his

11  religious beliefs conflicted with participation in the substance abuse programs offered at his

12  institution of confinement.  Indeed, petitioner concedes as much by informing this court that he

13  told the Board he "works the steps."  (Pet. at 37.)  Moreover, the 2008 parole hearing transcript

14  confirms that petitioner informed the Board he had attended AA meetings in prison.  (Id. at 142,

15  156-57.)

16    Under these circumstances, the state court's rejection of petitioner's First

17  Amendment claim is not an unreasonable application of clearly established Supreme Court

18  precedent, nor is it based on an unreasonable determination of the facts in light of the evidence.

19  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

20    C.  Bias of Board Members (fifth and seventh grounds for relief)

21    As described above, in his fifth ground for relief petitioner claims that the Board

22  members do not represent a cross-section of the community and cannot conduct a fair suitability

23  hearing, in violation of his rights under state law and the federal due process clause.  (Pet. at 6,

24  46-48.)  In support of this claim, petitioner cites California Penal Code § 5075(b).  That code

25  section states, in relevant part: "The selection of persons and their appointment by the Governor

26  and confirmation by the Senate shall reflect as nearly as possible a cross section of the racial,

1  sexual, economic, and geographic features of the population of the state."  In his seventh ground

2  for relief, petitioner claims that he was denied parole because of political pressure applied by "the

3  Governor's Office" not to grant parole to life prisoners, in violation of his right to due process.

4  (Pet. at 7, 50-51.)

5        The Ninth Circuit Court of Appeals has acknowledged that California inmates

6  have a due process right to parole consideration by neutral decision-makers.  See O'Bremski v.

7  Maass, 915 F.2d 418, 422 (9th Cir. 1990) (an inmate is "entitled to have his release date

8  considered by a Board that [is] free from bias or prejudice").  Accordingly, parole board officials

9  owe a duty to potential parolees "to render impartial decisions in cases and controversies that

10  excite strong feelings because the litigant's liberty is at stake."  Id. (quoting Sellars v. Procunier,

11  641 F.2d 1295, 1303 (9th Cir. 1981)).  Indeed, "a fair trial in a fair tribunal is a basic requirement

12  of due process."  In re Murchison, 349 U.S. 133, 136 (1955).  Petitioner is therefore correct that

13  he was entitled to have his parole release date considered by a Board that was free of bias or

14  prejudice.  However, petitioner has submitted no evidence to demonstrate that the Board was

15  under any pressure from the Governor's office to deny him parole or that any individual member

16  was otherwise biased against him at the time of his parole hearing in 2008.  Accordingly, he is

17  not entitled to federal habeas relief with respect to these claims.

18        Petitioner's claim that the Board's failure to represent a cross-section of the

19  community violates the California Penal Code is not cognizable in this federal habeas action.

20  See Wilson v. Corcoran, __ U.S. ___, 131 S. Ct. 13, 16 (2010); Rivera v. Illinois, ___ U.S. ___,

21  129 S. Ct. 1446, 1454 (2009) ("[A] mere error of state law . . . is not a denial of due process")

22  (quoting Engle v. Isaac, 456 U.S. 107, 121, n. 21 (1982) and Estelle v. McGuire, 502 U.S. 62, 67,

23  72-73 (1991)).  Petitioner has failed to demonstrate that any violation of state law constituted a

24  due process violation in the context of this case.  Accordingly, petitioner is not entitled to federal

25  habeas relief with respect to this claim.

26  /////

III.  Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing on his claims.  Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is appropriate under the following circumstances:

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> (A) the claim relies on-
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense[.]

Under this statutory scheme, a district court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support a petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  See also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005); Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." Earp, 431 F.3d at 1167 (citing Insyxiengmay, 403 F.3d at 670, Stankewitz v. Woodford, 365 F.3d 706, 708 (9th Cir. 2004) and Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001)).  To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).

It does not appear from the record that the California courts made any independent evidentiary findings.  Therefore, review in this case is based upon the findings of the Board, which held a full hearing at which it developed the facts.  This court concludes that no additional

1  factual supplementation is necessary in this case and that an evidentiary hearing is not

2  appropriate with respect to the claims raised in the instant petition.  The facts alleged in support

3  of petitioner's claims, even if established at a hearing, would not entitle petitioner to federal

4  habeas relief.  Further, petitioner has not identified any factual conflict that would require this

5  court to hold an evidentiary hearing in order to resolve.  Therefore, petitioner's request for an

6  evidentiary hearing should be denied as well.

7                                              CONCLUSION

8              Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

9  a writ of habeas corpus be denied.

10             These findings and recommendations are submitted to the United States District

11 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

12 one days after being served with these findings and recommendations, any party may file written

13 objections with the court and serve a copy on all parties.  Such a document should be captioned

14 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15 shall be served and filed within fourteen days after service of the objections.  Failure to file

16 objections within the specified time may waive the right to appeal the District Court's order.

17 Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

18 1991).

19             In any objections he elects to file, petitioner may address whether a certificate of

20 appealability should issue in the event he files an appeal of the judgment in this case.  See Rule

21 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a

22 certificate of appealability when it enters a final order adverse to the applicant); Hayward v.

23 Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc) (prisoners are required to obtain a certificate of

24 /////

25 /////

26 /////

appealability to review the denial of a habeas petition challenging an administrative decision such as the denial of parole by the parole board).

DATED: January 18, 2011.

_Dale A. Drozd_
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
birdwell2024.hc

28